BOARD OF ASSESSORS OF WEYMOUTH *vs.* THOMAS E. CURTIS
& others, trustees
(and five companion cases [1]).

Suffolk. January 6, 1978. — June 20, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & ABRAMS, JJ.

*Taxation*, Real estate tax: assessment, abatement; Assessors. *Evidence*,
   Hearsay, Burden of going forward.

Upon appeal by a town's board of assessors from decisions of the Appellate
   Tax Board granting abatements on two parcels of real estate, there
   was no merit to the assessors' argument that the board erred in admit-
   ting in evidence a study of sale transactions of properties during the
   relevant years because the sale prices listed in the study were hearsay.
   [497-498]
Evidence in real estate tax abatement cases before the Appellate Tax
   Board, including a study of the ratio of assessed value to sale price of
   40% to 50% of all residential properties sold during the relevant
   years, was sufficient to raise an inference of a scheme of discriminatory
   disproportionate assessment. [498-500]
Evidence in real estate tax abatement cases before the Appellate Tax
   Board was sufficient to support the board's finding that there existed a
   scheme of discriminatory assessment. [500-501]
In real estate tax abatement cases before the Appellate Tax Board, there
   was sufficient evidence to support the board's decision to reduce the
   assessment of the taxpayers' property from 100% to 70% of its fair
   market value. [501]

APPEALS from decisions of the Appellate Tax Board.
The cases were submitted on briefs.
*Lawrence M. Slater & Michael D. Meyerow* for the tax-
payers.
*Frank D. Rodick* for the Board of Assessors of Weymouth.

---

[1] Two of the companion cases were brought against Thomas E. Curtis
& others, trustees, and three cases were brought against Hy Winer & an-
other, trustees.

QUIRICO, J.   These cases are a consolidation of appeals from two decisions of the Appellate Tax Board (board) granting abatements of taxes on two parcels of real estate in Weymouth. The board's finding of the fair market value of the two parcels is not challenged on appeal. The questions presented here are whether there was sufficient evidence to support the board's finding that, during the years relevant to these cases, real property in Weymouth was assessed at 70% of its fair market value, and whether a study of ratios of assessed values to sale prices for some properties in Weymouth was properly admitted in evidence.

The first property that is the subject of these appeals is a small shopping center located on 125,900 square feet of land in Weymouth, and owned by the trustees of Curtlo Realty Trust (Curtlo).[2] The second parcel consists of 578,961 square feet of land and a building thereon, in Weymouth, owned by the appellees Hy Winer and another, trustees of Boston Super Markets, and leased to the appellee Ray-Mart Trust (Ray-Mart), which was required under the lease to pay a portion of the real estate tax on the property.[3] Both Curtlo and Ray-Mart[4] filed applications with the board of assessors for the town of Weymouth (assessors) for abatement of their respective real property taxes for the year 1973, the first six months of 1974, and the fiscal year 1975. Each application was denied by the assessors, and appeals were taken to the Appellate Tax Board.[5] On February 10,

[2] The trustees of Curtlo Realty Trust were the appellees Thomas E. Curtis, Richard D. Curtis, and Daniel J. Curtis.

[3] According to the findings of the board the subject property was leased to Ray-Mart for a twenty-year term beginning April 1, 1966. Ray-Mart was obligated to pay all real estate tax increases over the tax assessed in the base year of 1966.

[4] Both Ray-Mart and Hy Winer and another, trustees for Boston Super Markets, brought petitions for tax abatements for the property leased to Ray-Mart. For convenience they will be referred to in this opinion simply as Ray-Mart.

[5] With respect to the property leased by Ray-Mart, it filed the petition for abatement with the board for 1973, and Hy Winer and another, trustees of Boston Super Markets, petitioned for the 1974 and 1975 periods.

1976, the board held a separate hearing for each property on the issue of its fair market value.[6] The findings reached by the board at those hearings are not challenged here. In addition to the valuation question, however, both Curtlo and Ray-Mart claimed that they were victims of a scheme of disproportionate assessment because many parcels in Weymouth, and particularly residential property, were assessed at less than their market value. Since the factual and legal questions were the same for Curtlo and Ray-Mart on the issue of disproportion, the cases, as to this issue, were heard together.

At the hearing on the issue of disproportionate assessment, the only evidence introduced by Curtlo and Ray-Mart (taxpayers) was a study of sale transactions of properties during the relevant years (study). For each transaction the study listed the grantor, the grantee, the address of the property, the price recited on the deed as the sale price, and the assessed value of the property for the year following the sale. A ratio of assessed value to sale price was then calculated for each listing. The study listed 279 sales for 1972, 281 sales for 1973, and 283 sales for 1974. The transactions listed were almost exclusively sales of residential properties. The study showed that the properties sold in 1972 were assessed the following year at an average of 72.3% of the sale price, those sold in 1973 at 65.8%, and those sold in 1974 at 63.07%.

A copy of this study had been provided to the assessors on October 10, 1975. The hearing before the board on the question of disproportionate assessment, originally scheduled for February 10, 1976, was continued until March 24, 1976, in order to give the assessors additional time to examine the study and to prepare an exhibit of their own. At the March 24 hearing the study was admitted in evidence over the assessors' objection. The taxpayers did not indicate on what basis the transactions listed were chosen for inclu-

---

[6] The three petitions for abatement for each property, each relating to a different year, were heard together.

sion in the study, other than that an attempt had been made to limit the listing to sales of residential properties. Nor did the taxpayers produce any evidence beyond the study, such as certified copies of deeds or the assessment records, which corroborated the sale prices or the assessed values listed therein. There was, however, testimony from one of the assessors that he reviewed the sale prices and the assessments and found a substantial number of them to be correct.

Testimony elicited by the assessors attempted to show that no discrimination existed in the town's assessing practices. There was evidence that all the property in Weymouth had been revalued by an outside assessing firm during 1968. Since that time the assessors had revalued property only if improvements had been made to it. A member of the Weymouth board of assessors testified that it was the policy of the assessors to assess all property in the town at 100% of fair market value. In an attempt to discredit the taxpayers' study, an employee of the assessors testified that his research, done in preparation for this case, had indicated that in Weymouth in 1972, 1973, and 1974, there had been 1,200, 1,300, and 1,400 real estate sales, respectively, of which 700, 650, and 520 were for residential properties. The assessors also questioned specifically about fifty listings in the study, and the taxpayers agreed to strike them.[7] The board gave the assessors until April 12, 1976, to file a written response to the study. Such a response was filed, and it challenged ninety-seven sales on various grounds.[8]

The board found that the assessment to sales ratio study "represented a substantial amount of the total sales that took place in each of the years in question, and that . . . [the] study represented a substantial amount (about 40 to

---

[7] The Weymouth assessor who challenged these fifty listings was unable to identify specific grounds for the challenges.

[8] The sales were challenged on various grounds including (1) that they may have been made between parties that were related, either by family or in a legal sense, such as trustee and beneficiary, (2) that the records on the transaction could not be found, or (3) that the year of the sale was incorrectly given in the study.

50%) of the residential sales that took place for the years in question." It noted the challenge made to ninety-seven sales by the assessors. Nevertheless it held, on the basis of all the evidence presented to it, that the taxpayers had sustained their burden of raising an inference that the assessors engaged in a scheme of discriminatory disproportionate assessment. The board also decided that the assessors did not go forward to show that there was no such scheme. The board therefore concluded that the taxpayers were entitled to relief, and that the ratio of assessment to fair market value for the relevant years was 70%. It granted abatements to the taxpayers, reducing the assessment on the property of each to 70% of what had previously been determined to be its fair market value.

On these appeals from the board's decisions the assessors make three claims. They argue (1) that the assessment to sale price ratio study was inadmissible because it was hearsay, (2) that there was insufficient evidence to support the board's determination that the taxpayers had raised an inference of a scheme of discriminatory disproportionate assessment, and (3) that the board's finding that real property in Weymouth was assessed at 70% of its fair market value was also not based on sufficient evidence.

1. The first claim raised by the assessors is that the admission in evidence of the sale prices listed in the taxpayers' ratio study was error because those prices were hearsay. Although we agree that the prices were hearsay, we nevertheless find no merit to the argument that they were not properly admitted before the board.

Relying on *First Nat'l Stores, Inc.* v. *Assessors of Somerville,* 358 Mass. 554 (1971), the assessors admit that the sale prices would have been admissible had they been offered through the certified copies of the relevant deeds. The assessors also conceded, after having examined the study during the time period given to them by the board for that purpose, that the prices contained in the study were in sub-

stantial agreement with those recited in the deeds.[9] This places the assessors in the position of admitting the reliability of the price figures, but arguing nevertheless that they should have been excluded because their admission was in technical violation of the hearsay rule. Such a position not only conflicts with an important objective of the rules of evidence, which is to ensure that trustworthy evidence be presented to the trier of fact, *Dallas County* v. *Commercial Union Assurance Co.*, 286 F.2d 388, 395-397 (5th Cir. 1961), K.B. Hughes, Evidence § 452 (1961); W.B. Leach & P.J. Liacos, Massachusetts Evidence 184 (4th ed. 1967); 5 J. Wigmore, Evidence § 1362 (Chadbourn rev. 1974). Cf. *Andrews, petitioner,* 368 Mass. 468, 476-477 (1975), but it is also clearly at variance with Rule 37 of the Rules of Practice and Procedure of the Appellate Tax Board (1974), which states that the practice in proceedings before the tax board will be such that "substance and not form shall govern." Cf. *Commonwealth* v. *Trainor,* 374 Mass. 796, 803 (1978); *Dyecraftsmen, Inc.* v. *Feinberg,* 359 Mass. 485, 487 (1971); G. L. c. 30A, § 11 (2).

The assessors also contend that the ratio study should have been excluded because it was statistically invalid, i.e., that the sales listed were not selected rationally and impartially, and that they were not made at arm's length. We think, however, that this claim is relevant not to the question of the admissibility of the exhibit, but rather to that of the weight that is to be given to it by the fact finder.

2. In this Commonwealth it is both a constitutional and statutory requirement that real property be assessed at its full and fair cash value. Part II, c. 1, § 1, art. 4 of the Con-

---

[9] As a result of questioning by the commissioner of the board, one of the Weymouth assessors stated at the hearing that he checked the sale prices and the assessments listed in the study and found them to be correct in all but a few instances. The assessors also requested from the board a finding of fact that "[t]he dollar amount listed for each transaction in the appellant's study is identical to the consideration as recited in the appropriate deed, except as noted in the record by objection of the Vice-Chairman of the Board of Assessors."

stitution of the Commonwealth. Art. 10 of the Declaration of Rights. G. L. c. 59, §§ 38, 52. *Coomey* v. *Assessors of Sandwich*, 367 Mass. 836, 837 (1975). It appears, however, that full value assessment is not the practice in some cities and towns, and we have consequently recognized "the right of the taxpayer whose property alone is taxed at 100 per cent of its true value . . . to have his assessment reduced to the percentage of that value at which others are taxed even though this is a departure from the requirement of statute. The conclusion is based on the principle that where it is impossible to secure both the standard of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law." *Shoppers' World, Inc.* v. *Assessors of Framingham*, 348 Mass. 366, 373 (1965), quoting from *Sioux City Bridge Co.* v. *Dakota County, Nebraska*, 260 U.S. 441, 446 (1923). In order to secure such an abatement a taxpayer must prove that the assessors have engaged in a scheme of disproportionate and discriminatory assessment. *Coomey, supra* at 838. Because of the difficulties confronting a taxpayer who attempts to make such proof, we have held that "once a taxpayer proves improper assessments of such a number of properties as to justify an inference that such a scheme [of discriminatory assessment] exists, the assessors have the burden of going forward to disprove the existence of such a scheme." *Beardsley* v. *Assessors of Foxborough*, 369 Mass. 855, 858 (1976). The assessors here argue that the evidence was insufficient to support the board's findings both that the necessary inference had been raised and that such a scheme existed. We note that findings of fact made by the board are final pursuant to G. L. c. 58A, § 13, and therefore our inquiry here is limited to the question whether as matter of law the evidence was sufficient to support the findings. *Beardsley, supra* at 856 n.3.

It is our conclusion that the ratio study showed a sufficient number of improperly assessed properties to justify an inference that a scheme of discriminatory assessment existed. Approximately 280 properties were listed for each of

the three relevant years, and the average assessment for this group was substantially below its market value as reflected in the sale prices. The board found that the study represented about 40% to 50% of all residential properties sold during each year. This is more than "a small subdivision." *Beardsley, supra* at 859 n.6. The failure of the taxpayers to provide an explanation of the procedure used for selecting those sales that were listed may weaken the value of the study, but it certainly does not do so to such an extent that we must hold as matter of law that the evidence was insufficient to raise the necessary inference.

The more substantial question raised here is whether the assessors satisfied their burden of going forward to disprove the existence of the scheme, and whether the evidence taken as a whole was sufficient to justify the board's conclusion that such a scheme did, indeed, exist. The assessors offered testimony to support their position; however, as in *Beardsley*, "[r]ather than rebut the inference [of disproportionate assessment], the evidence offered by the assessors tended to support it." *Id.* at 859. The testimony of the Weymouth assessor that it was the assessors' policy to assess property in the town at 100% merited consideration, but it must also be noted that no other evidence was entered to support this contention. In fact, the assessing practice described by the board member leads us to the opposite conclusion. While the practice of not revaluing individual properties after the 1968 revaluation, unless improvements were made, may be an acceptable method of maintaining a fair assessment balance between unimproved properties, it is certainly prejudicial to those properties, like the parcels in question in the instant cases, that for one reason or another are reassessed after 1968 at figures equal to their full value as of the time of assessment. An argument that real estate values did not increase from 1968 to 1974 is a difficult one to accept in the face of common knowledge to the contrary.

Another factor of great significance to this question is the answer, or lack thereof, of the assessors to the taxpayers' study. The assessors were allowed six months to analyze this

exhibit so that they might challenge it and offer an alternative that would support their position. No such alternative was provided. The only response made by the assessors to the study was a challenge to ninety-seven of the approximately 843 listings in the exhibit.[10] We do not believe that such a limited challenge seriously undermines the evidentiary value of the listing.

We therefore hold that the evidence was sufficient to support the board's finding that a scheme of discriminatory assessment existed in Weymouth.

3. The assessors finally contend that the evidence was insufficient to support the board's decision to reduce the assessment of the taxpayers' property to 70% of its fair market value. The assessors complain that the study on which the ratio figure was based included only sales of residential properties. This was not improper, however, since a taxpayer has a right to have his assessment reduced so that it is "proportional to the assessments of the class of property valued at the lowest percentage of fair cash value." *Shoppers' World, Inc.* v. *Assessors of Framingham, supra* at 377-378 n.10. And we conclude that the listing, including as it did over half the sales of residential properties for each year, was a sufficient basis on which to form a determination of the ratio of assessed value to fair market value for the entire class of residential properties, particularly since no contrary evidence was offered by the assessors. Therefore the reduction of the assessment to 70% of the market value was proper.

4. The decisions of the Appellate Tax Board are affirmed.

*So ordered.*

---

[10] The principal basis for the challenges of the assessors was that some of the sale transactions were not at arm's length; i.e., that they were between relatives or between persons closely associated in other ways, such as a corporation and its majority shareholder. It appears to us, however, that the inclusion in the study of some sales of this type would in fact benefit the assessors, since the sale prices for these would tend to be less than fair market value, with a corresponding increase in the assessment to sale price ratio.