HAROLD BROWN & others *vs.* BOARD OF ASSESSORS OF BROOKLINE.

No. 96-P-584.

Suffolk. April 7, 1997. - August 7, 1997.

Present: DREBEN, KAPLAN, & LENK, JJ.

*Taxation,* Real estate tax: assessment, Assessors, Appellate Tax Board: findings. *Constitutional Law,* Taxation.

The Appellate Tax Board correctly denied abatements to property owners who did not make a threshold showing that a board of assessors employed a deliberate scheme of discriminatory or disproportionate assessment with respect to their property for the years in question. [332-333]

APPEAL from a decision of the Appellate Tax Board.

*David Lee Turner,* Town Counsel, for the defendant.

*Eric W. Wodlinger* for the plaintiffs.

DREBEN, J. These are 144 consolidated appeals under G. L. c. 58A, § 13, from a decision of the Appellate Tax Board (board) denying abatements to the appellant property owners because they failed to satisfy the preliminary threshold of showing that the Brookline board of assessors employed a deliberate scheme of discriminatory or disproportionate assessment. We affirm the decision of the board.

The appellants, owners of rent-controlled apartment buildings in Brookline, claimed that their properties for the fiscal years 1985, 1986, and 1987 had been disproportionately assessed: that is, their properties had been assessed at a higher percentage of fair cash value than the class of single-family homes in Brookline. In their abatement petitions the appellants also asserted that their properties had been overvalued by the town,

but the parties reached agreement on the valuations eighteen months after the hearings on disproportion had closed.[1]

In order to obtain relief on the basis of disproportionate assessment, a taxpayer must show that there is an "intentional policy or scheme of valuing properties or classes of property at a lower percentage" of fair cash value than the taxpayer's property. *Shoppers' World, Inc.* v. *Assessors of Framingham*, 348 Mass. 366, 377 (1965) (citation omitted). If the taxpayer presents evidence that supports an inference that a scheme of disproportionate assessment exists, the assessors have the burden to show that there was no such scheme, *ibid.*, but the taxpayer has the ultimate burden of persuasion. *First Natl. Stores, Inc.* v. *Assessors of Somerville*, 358 Mass. 554, 562 (1971). See *Stilson* v. *Assessors of Gloucester*, 385 Mass. 724, 727-728 (1982).

In the view of the appellants, an intentional discriminatory scheme existed because, in a period of dramatically increasing property values, namely fiscal years 1985, 1986, and 1987, the assessors deliberately kept assessments of single-family residences constant, relying on the 1985 certification of the Commissioner of Revenue (commissioner) pursuant to G. L. c. 40, § 56. Assessments did not change until 1988 when the next certification under the statute occurred.

Chapter 40, § 56, was part of a 1979 legislative effort to effect valuation at full and fair cash value throughout the Commonwealth, see *Keniston* v. *Assessors of Boston*, 380 Mass. 888, 890-891 (1980), and, as amended by St. 1983, c. 79, § 1, provides that the commissioner "shall triennially certify as to whether the board of assessors is assessing property at full and fair cash valuation."[2]

---

[1]By agreement of the parties the board delayed its decision pending the parties' agreement on the issue of overvaluation. The appellants assert, and the board found, that the parties agreed in 1992 to the fair cash values of the parcels. The record, however, does not contain the agreement, nor does it show what values were agreed upon.

[2]Prior to the passage of art. 112, a 1978 Amendment to the Massachusetts Constitution, different classes of property could not be taxed at different rates. *Cheshire* v. *County Commrs. of Berkshire*, 118 Mass. 386, 389 (1875). Section 56 certification by the commissioner permits municipalities to classify and tax property according to classes, as authorized by art. 112, for the year of certification and the two succeeding fiscal years. Testimony of a tax examiner of the Department of Revenue, as well as an exhibit introduced in evidence (Informational Guideline Release No. 83-405, entitled "Fiscal Year 1985 Guidelines for Classification and Taxation of Property According to Use"),

To show that the "scheme" of reliance on the 1985 certification for three fiscal years resulted in disproportionate assessments, the appellants, in addition to presenting three witnesses and an appraiser's report, introduced the commissioner's "equalized valuation" (EQV) reports for 1984 and 1986. The commissioner is required under G. L. c. 58, § 9, as amended through St. 1987, c. 712, § 1, to establish every two years "a proposed equalized valuation which shall be the fair cash value of all property in such city or town subject to local taxation . . . ." In addition, he must determine assessment ratios, which are a comparison of assessed values to the fair cash values of properties, derived primarily from a comparison of assessed values with selling prices. See G. L. c. 58, § 10. See also G. L. c. 58A, § 12C, set forth in the margin.[3] The ratios are computed by dividing the assessed valuations by the sales prices and expressing the quotient as a percentage. *Macioci* v. *Commissioner of Rev.*, 386 Mass. 752, 756 n.8 (1982). Thus if the assessment ratio is 1, the assessment and fair cash value are the same; if less than 1, for example, 0.85, it means that the assessed value is only 85% of the fair cash value.

The commissioner's biennial EQV reports are admissible in evidence, and the assessment ratios contained in the EQV reports are prima facie evidence of the ratios at which properties are assessed. See G. L. c. 58, § 12C (note 3, *supra*). According to the 1984 "equalized valuation" (fair cash value) report, the assessment ratio for the single family class in Brookline was 0.85, or 85%, while the ratio for the apartment class was 1.0. The 1986 EQV report states that both the single-

indicate that the commissioner requires certification pursuant to § 56 even if a municipality has a single tax rate.

[3]Section 12C, as inserted by St. 1979, c. 383, § 3, provides in relevant part: "In any appeal relative to the assessed valuation of property, the reports of the ratios which assessments in the city or town bear to the fair cash value of each class of property therein and the ratio which the total assessed value bears to the total fair cash value therein as determined by the commissioner's report made pursuant to sections ten and ten C of chapter fifty-eight shall be admitted into evidence by the appellate tax board on its own motion and shall be prima facie evidence of the assessment practices of the city or town and the ratios at which property is assessed for the year for which said determination is reported by the commissioner and for each following year until a new determination is reported by said commissioner under said section ten C."

family and the apartment building class had the same ratio, namely 0.71, or 71%.[4]

The appellants argue that since their properties were valued at fair cash value (by virtue of their 1992 agreement with the assessors, see note 1, *supra*), they are entitled to at least[5] a reduction to 85% of fair cash value for fiscal 1985 and to 71% of fair cash value for fiscal years 1986 and 1987.[6] See *Tregor* v. *Assessors of Boston*, 377 Mass. 602, 612, cert. denied, 444 U.S. 841 (1979) (taxpayer who is disproportionately assessed is entitled to an abatement to the assessment of the class of property valued at the lowest percentage of fair cash value).

To counter the appellants' disproportion claim, the assessors presented the testimony of George Moody, deputy chief assessor for the town. Previously he had been chairman of the board of assessors in Plymouth. He explained why the town did not "factor"[7] property values during the years following the 1985 fiscal year certification despite the large increase in property values. He pointed out that values in certain neighborhoods typically increase at a rate greater than others and that applying an average percentage factor to all properties of a given class

---

[4]The appellants argue that the significance of the two classes having the same ratio is limited because "the appropriate inquiry is . . . whether [the appellants'] properties have been taxed disproportionately compared to *any other* class of property within the [t]own."

[5]The board acted within its discretion in rejecting the ratios derived by the appellants' appraiser on the ground that he chose sales occurring after the relevant assessment date. Cf. *Axelrod* v. *Assessors of Boxborough*, 392 Mass. 460, 464 (1984).

[6]As indicated in note 1, *supra*, the parties' 1992 agreement, made eighteen months after the hearing before the Appellate Tax Board, is not included in the record and we have not gone behind the agreement. We note, however, that the figures agreed upon in 1992 to settle the controversy as to overvaluation may not be probative to show that for fiscal years 1985, 1986, and 1987 the appellants' properties were assessed at 100% while other classes of properties were deliberately assessed at a lower percentage of value. Compare *Shoppers' World, Inc.* v. *Assessors of Framingham*, 348 Mass. at 372-373; *Sioux City Bridge Co.* v. *Dakota County, Neb.*, 260 U.S. 441, 446 (1923).

[7]As described by the board, "The process of factoring involves applying a percentage adjustment to the certified values of all properties within a particular class in assessing property in years following a certification to account for changes in the market. For example, if the assessors had determined that the value of single family residences in the town had increased 12% between fiscal years 1985 and 1986, they could have chosen to request the commissioner's permission to factor the values certified for fiscal year 1985 by increasing the values 12% in arriving at a fiscal year 1986 valuation."

often leads to inequities among the various neighborhoods within a community. His experience in Plymouth where factoring had been tried in one year was that factoring led to a significant increase in abatement applications. In his opinion, values in the various neighborhoods in a city or town do not increase at a uniform rate. Moody also indicated that it was his understanding, which was also the understanding of the appellants' witness from the Department of Revenue, that the commissioner will only allow factoring if the same percentage adjustment is made to all properties of a given class regardless of location.

On the evidence presented, the board concluded that by holding the values of property constant during the revaluation cycle, a practice found by the board to be common among many communities, the assessors made a reasonable effort to apply a uniform standard of valuation to all property and did not employ a deliberate scheme of discriminatory or disproportionate assessment. The board also found that there was no credible evidence that market forces affected the value of single-family residences more than the value of rent-controlled apartment buildings. Pointing out that even with the use of ratios of assessments to fair cash values, "it is impossible to secure exact equality or proportion in the imposition of taxes," *Keniston* v. *Assessors of Boston*, 380 Mass. at 896, the board cited *Axelrod* v. *Assessors of Boxborough*, 392 Mass. 460, 463 (1984), a case that rejected the claim of a taxpayer that his remedy was inadequate. The taxpayer argued that the use of a 1978 equalized value of the town during a period of rising prices was improper to determine an abatement for fiscal 1979. The court, although recognizing that "in order to ensure precise proportionality," the fair cash value of the town would have to be determined on the assessment date for the fiscal year in question, held that, "[i]n light of the difficulty of making a determination of the fair cash value of a town," the Legislature could rationally determine that the Department of Revenue need make such determinations only in alternate years. The same considerations precluded burdening the board with making fair cash value determinations for years in which the Department of Revenue did not do so. *Id.* at 464. Drawing on the analogy of *Axelrod*, the board supported its decision by stating that it viewed the amendment to G. L. c. 40, § 56, which provided for revaluation and certification every three years, instead of, as

previously, every two years, as a legislative recognition of the administrative burden for cities and towns to comply with the revaluation and certification process.[8]

As to the prima facie effect of the 1984 assessment to fair cash value ratio as evidence of the town assessment practices for fiscal years 1985 and 1986, the board found that in this period of escalating values, the revaluation and certification of all property as of fiscal 1985 rebutted the 1984 EQV evidence. This is because the 1984 assessment ratio was calculated by comparing assessments as of January 1, 1983, with sales in the last six months of 1982 and the first six months of 1983, while the fiscal 1985 valuation and certification process reviewed sales taking place in calendar year 1983 for certifying values as of January 1, 1984. This later sales period, the board found, made the certification valuation "far more credible" than the 1984 EQV evidence for fiscal years 1985 and 1986.

With respect to fiscal year 1987, where the 1986 assessment ratio was 0.71, the appellants have made a prima facie case of disproportionate assessment. That, however, is not enough, since under *Shoppers' World, Inc.* v. *Assessors of Framingham*, 348 Mass. at 377, the appellants also have to show that there was an intentional scheme of disproportionate assessment. Since the board did not find such a scheme, it refused the appellants an abatement for fiscal year 1987.

A decision of the board is "final as to findings of fact." G. L. c. 58A, § 13. "In reviewing mixed questions of fact and law, the board's expertise in tax matters must be recognized, and its decisions are due 'some deference.' In particular, we should respect the board's judgment concerning the feasibility and fairness of alternate proposed methods of property valuation." *Massachusetts Inst. of Technology* v. *Assessors of Cambridge*, 422 Mass. 447, 452 (1996) (citations omitted).

We see no basis in the record for rejecting the board's determination that the assessors' reliance on the 1985 certified valuations for the three-year period, a common practice among many communities, was a reasonable effort to apply the ap-

---

[8]While declining to allow the triennial process to relieve a city or town of its responsibility for determining the fair cash value of all property on a yearly basis, see G. L. c. 59, § 2A, the board opined that, if there is an error in a given year due to the assessor's use of a value certified under § 56, it considered the appropriate remedy an abatement claim based on overvaluation, not on disproportionate assessment.

propriate standard and did not constitute a deliberate scheme of disproportionate assessment. This is particularly true where the board found no credible evidence that rent-controlled apartment buildings such as those owned by the appellants were less affected by the escalating market than were single family residences. The cases relied upon by the appellants do not indicate the contrary.[9] Accordingly, the decision of the Appellate Tax Board is affirmed.

*So ordered.*

---

[9]The appellants' reliance on *Assessors of Weymouth* v. *Curtis*, 375 Mass. 493, 500 (1978), is misplaced. In that case only a specific segment of the town's property — those parcels that had been improved — including the parcels of the taxpayers, were reassessed at full value in a seven-year period of rising prices. The court indicated that, while "the practice of not revaluing individual properties after the 1968 revaluation, unless improvements were made, may be an acceptable method of maintaining a fair assessment balance between unimproved properties," the scheme was prejudicial to those properties that were reassessed. That Moody testified that adjustments were made in Brookline to reflect building permits, demolitions, or additions, does not mean that the improved properties were, as in *Curtis*, valued at figures equal to their full value.