CITY OF NEWTON vs. COMMISSIONER OF REVENUE.

Suffolk.  May 22, 1981. — July 22, 1981.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Taxation,* Real estate tax: assessment, revaluation; Commissioner of Revenue. *Municipal Corporations,* Municipal finance. *Newton.*

With respect to G. L. c. 59, § 21C, inserted by St. 1980, c. 580, § 1, which restricts the amount of property taxes a city or town can levy to 2½ % of its "full and fair cash valuation," the Commissioner of Revenue had authority to issue a guideline which requires municipalities whose assessments are not at full and fair cash value to measure their full and fair cash value by implementing a single normative standard of Statewide application [120-121], and the Commissioner acted reasonably in using a Statewide annual inflation rate of 13 % to increase a city's 1980 equalized valuation to the level of January 1, 1981, in determining its property tax levy for the 1982 fiscal year [121-122].

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on March 20, 1981.

The case was heard by *Wilkins,* J.

The case was submitted on briefs.

*Francis X. Bellotti,* Attorney General, & *James A. Aloisi, Jr.,* Assistant Attorney General, for the defendant.

*Richard W. Renehan, Miriam Vock Sheehan, Daniel M. Funk,* City Solicitor, & *Wayne Frigard,* Assistant City Solicitor, for the plaintiffs.

HENNESSEY, C.J.  The city of Newton (Newton) challenges guidelines issued by the Commissioner of Revenue (Commissioner) which require Newton to use its 1980 equalized valuation, adjusted by 13 % to account for inflation and other factors, as "full and fair cash valuation" to determine the limitation on Newton's property tax levy for fiscal year 1982.  Newton contends that the Commissioner

has exceeded her authority[1] and further contends that, while the 13% adjustment intended for Statewide application may be a reasonable figure for some communities, as to Newton the guidelines are arbitrary and unreasonable. We uphold the declaration of the single justice that the Commissioner neither exceeded her authority nor acted unreasonably.

On November 4, 1980, by an initiative petition Massachusetts voters enacted legislation commonly referred to as Proposition 2½. The tax limitations of Proposition 2½ pertinent to this case appear in G. L. c. 59, § 21C, inserted by St. 1980, c. 580, § 1. Section 21C (1) states the basic limitation; it restricts the amount of taxes a city or town can levy to 2½ per cent of its "full and fair cash valuation." Section 21C (4) permanently limits annual increases in property taxes. A city or other governmental entity may increase its taxes by only two and one-half percent from one year to the next even though growth in its full and fair cash valuation may substantially exceed that rate. Section 21C makes the initial calculation of a city's "full and fair cash valuation" crucial because the taxes raised under the initial determination will be a bench mark for calculating the amount by which a locality can increase taxes in future years.[2]

In July, 1980, prior to the enactment of Proposition 2½, Newton began a program, still in progress, to revalue each

---

[1] The Commissioner presents the issue as to where authority to establish valuation lies, in the following informative words: "Whether in the absence of a general revaluation which achieves a full and fair cash valuation of property, cities and towns may establish for themselves, for purposes of determining a limit on their fiscal year 1982 tax levy, a valuation that they do not intend to use as assessed values on the basis of which taxes will be levied for fiscal year 1982?"

[2] Newton has expressed the fear that the determination of full value for fiscal 1982 will be an unremitting bench mark that will tie the city to this determination of full value for the indefinite future, no matter what the results of Newton's fiscal 1983 revaluation program indicate. The question whether G. L. c. 59, § 21C, permits or requires the Commissioner to recalculate a community's full and fair cash value if it is later determined that her initial fiscal 1982 calculation was low (or high, for that matter) is not before the court in this case.

of its 24,500 parcels to full and fair cash value pursuant to a plan approved by the Commissioner.[3]  Under the plan, however, complete revaluation of Newton's taxable properties will not be completed until June, 1982.  Proposition 2½ requires a determination of full and fair cash valuation as of January 1, 1981, for purposes of calculating the tax levy limit.  Because Newton's aggregate assessments will not by then equal its full and fair cash valuation, adjustment of the aggregate assessments is required in order to determine full and fair cash valuation in compliance with the requirements of Proposition 2½.  Accordingly, Newton formulated a methodology to make the necessary adjustment, as described in the margin.[4]  On December 4, 1980, however, the Commissioner announced her intention to require Newton to use a different formula.[5]  Newton, on December 22, 1980, submitted a summary of its proposed methodology to the Commissioner.  Without commenting on either Newton's objections or its proposed alternative, the Commis-

---

[3] In 1972, a judge of the Superior Court ordered a revaluation of all property in Newton and implementation of those new values in fiscal 1976.  In that year, and in subsequent years, the city sought and received extensions in the implementation of such new values.

[4] Newton used a more recent sampling period than did the Commissioner, see note 5, *infra*, measuring the actual changes in its composite sales ratio from month to month, and, by statistically "trending" those changes, projected the composite sales ratio at the end of the sampling period.  Cf. note 6, *infra*.

[5] The Commissioner's preliminary full and fair cash valuation as of January 1, 1981, of a community which will not complete its revaluation program until fiscal 1983 was determined by using the community's final 1980 equalized valuation updated to January 1, 1981, by a uniform inflation factor of 13%.  The 13% inflation factor was based upon an analysis of Statewide real estate market trends.  This analysis included consideration of the following three factors:  (1) the increase in Statewide property values as measured by the differences between the 1978 and 1980 equalized valuations, which projected an annual 13.2% increase; (2) assessment certification studies conducted in certain communities during 1978 and 1980, indicating an annual increase in property values of 13.1%; and (3) the Massachusetts Association of Realtors' Multiple Listing Service, which indicated a 12.7% annual increase in the average residential sale price.

sioner on February 24, 1981, issued a directive entitled "Guidelines for Adjustment of Preliminary Full and Fair Cash Value" (guidelines). The directive states: "Where assessments as of January 1981 do not reflect full and fair cash value in accordance with the Commissioner's certification standards, the Department will *not* [emphasis in original] measure the tax levy limitation against the total assessed value of a municipality's taxable property. Since these communities are in the process of revaluing property to comply with constitutional and statutory requirements by fiscal year 1983, *it seems reasonable to substitute for assessed value the 1980 Equalized Valuation, increased by the uniform factor of thirteen percent . . .*" (emphasis supplied). The Commissioner has refused to review Newton's analysis or to express any view as to the integrity or accuracy of the analysis. We likewise decline to resolve this case on the basis of which methodology we prefer.

The Commissioner's guidelines and Newton's alternative methodology are similar in several respects. Both approaches to the determination of Newton's full and fair cash valuation start with the premise that Newton's assessments do not equal full and fair cash value and must be adjusted to approximate that value accurately. To make the necessary adjustment, both approaches are founded upon sales data supplied by local assessors and averaging methods used in the Commissioner's biennial determination of equalized valuation.[6] Both parties consider it necessary, in order to adjust for undervaluation, (1) to compare prices to assessed valuations for individual properties that have changed hands in a sample period, (2) to average individual ratios of sale prices to assessed valuations ("sales ratios") in order to determine a composite sales ratio for each class of property,

---

[6] Equalized valuations are calculated by the Commissioner only every two years, G. L. c. 58, §§ 9-10C. They are "primarily intended to provide a basis for the allocation of the county tax and certain State aid," *Keniston* v. *Assessors of Boston*, 380 Mass. 888, 892 n.8 (1980). Newton's 1980 equalized valuation was computed by the Commissioner for implementation on January 1, 1980.

and (3) to apply the resulting composite sales ratios to the total assessed valuations for each class to arrive at total market value. Finally, both approaches recognize the need to adjust the essentially static values resulting from averaging sales ratios over a sample period by taking account of increases over time in market values as a result of construction, conversion and, most importantly, appreciation and inflation. It is in their methods of adjusting for price increases that the alternative approaches part company.

Although Newton disputes the Commissioner's choice of sample period and other similar details, the Commissioner's approach to escalating property values differs from Newton's in primarily one critical respect. The Commissioner's formula assumes an escalation of property values in calendar year 1981 of 13%, above and beyond new construction and other additions to the tax roles; Newton contends that, even if this figure is a reasonable figure for Statewide application, this approach takes no account of the far greater escalation of values in Newton. According to the Commissioner's own equalized valuation studies for 1978 and 1980, Newton's values were increasing at the rate of 23.5% a year while property values Statewide were increasing at the rate of 13%.[7] Use of the Commissioner's approach allows Newton a maximum tax levy for fiscal year 1982 of $62,458,734,

[7] It is, initially, an attractive proposition to suggest, as Newton does, that the equalized valuation figures for 1978 and 1980 can be utilized to produce a community-specific inflation factor to be used to adjust the 1980 equalized valuation for use in fiscal 1982. Underlying such a proposition, of course, is the assumption that those factors causing appreciation of residential real estate from 1978 to 1980 have remained constant in each community and can be used to produce an accurate projection of values for fiscal year 1982. We cannot force the Commissioner to accept this assumption in its entirety, although the Commissioner uses such an assumption in her own methodology when she utilizes the projection based on equalized valuations. See note 5, *supra*. The Commissioner only uses such a projection as a *portion* of her analysis, however, declining to accept such an assumption as wholeheartedly as does Newton. Instead, the Commissioner tempers her projection by including an analysis of other figures which are not uniformly available for each affected community. Thus, the Commissioner's analysis will only produce a representative projection for Statewide application.

while Newton's methodology would permit a maximum tax levy of $74,250,000 — a difference of approximately $11,800,000.

The case at bar resolves to two questions: (1) whether the Commissioner has the authority to issue a guideline which requires communities whose assessments are not at full and fair cash value to measure their full and fair cash value by implementing a single normative standard of Statewide application, and (2) whether, having such authority, the Commissioner acted reasonably in establishing the precise standard embodied in the guideline. We conclude that the Commissioner did indeed have such authority and that the disputed guideline is a reasonable exercise of that authority.

The Commissioner's authority to issue guidelines implementing a Statewide property tax scheme requiring a measure of uniformity is beyond debate. The Commissioner has the power to issue guidelines which comprehend "the administration of all laws providing for the assessment and classification of property." G. L. c. 58, § 1, as appearing in St. 1979, c. 797, § 3. Proposition 2½ is plainly a law "providing for the assessment and classification of property." The Commissioner, by statute, has the authority to *enforce all laws relating to the valuation, classification and assessment of property*" and to "*supervise the administration of such laws by local assessors in accordance with the rules, regulations and guidelines established under the provisions of [G. L. c. 58, § 1]*" (emphasis supplied). G. L. c. 58, § 1A. Newton contends that the Commissioner's guidelines usurp the authority of local assessors to determine what valuations will be placed on property in Newton. We disagree. While the assessors may make their own determinations, within general principles established by lawful orders, regulations, or determinations of the Commissioner, G. L. c. 58, §§ 1A, 3, the language of § 1A clearly establishes that the Commissioner has the right and the duty to determine whether the fiscal year 1982 tax rate in Newton complies with the requirements of Proposition 2½. Cf. *Commonwealth* v. *Andover*, 378 Mass. 370, 377-378 (1979);

*Sudbury* v. *Commissioner of Corps. & Taxation*, 366 Mass. 558, 563-564 (1974). General Laws c. 58, § 1A, expressly confers upon the Commissioner enforcement powers to be used if the Commissioner determines that a "law relating to the valuation, classification and assessment of property" is being violated.

Once it is determined that the Commissioner has the authority to issue the challenged guidelines, the remaining question is whether those guidelines are a reasonable exercise of executive authority. The Commissioner has used a Statewide annual inflation rate of 13% to increase Newton's 1980 equalized valuation to the level of January 1, 1981. There is nothing in the record to show that the 13% factor, derived from 1978 and 1979 experience, is inappropriate for use on a Statewide basis in 1980. To the contrary, the record, by affidavit and otherwise, supports an inference of reasonableness.[8] The Commissioner's adjustment, of course, gives no individualized consideration to variation in local conditions.

The Commissioner does not contend that her guidelines achieve perfection in result and thereby enable communities which do not have full-value assessments to arrive at a valuation figure precisely identical to their actual full and fair cash value (i.e., 100%). In fact, it is her view that only a parcel-by-parcel appraisal pursuant to an appropriate revaluation program can achieve such results. What the Commissioner has done in this case is to fashion a normative standard based upon reliable data which (1) can be applied equally to each underassessed community and (2) can be relied upon by her as sufficient to produce values reasonably approximate to full value.

The question raised implicitly by Newton is why the Commissioner did not choose to issue guidelines which would allow communities like Newton to calculate full value by using 1980 equalized valuations plus a community-specific inflation factor. The answer is that, for the Commissioner

---

[8] See note 5, *supra*.

to be able to test community-specific inflation rates for calendar 1980, she would essentially be required to perform a revaluation of the community — or at least undergo a process similar to her equalization studies. The Commissioner would have to perform extensive testing of a twelve-month period which would necessarily have to include detailed, pragmatic studies. We accept the Commissioner's argument that such a process would be impracticable given the amount of time and resources available to perform the task. We have in mind that this is a Statewide matter the Commissioner is dealing with.[9] The Commissioner has made a judgment conceding perfection in result, in favor of a process which is orderly, expeditious, and reliable. It is an exercise of judgment that is neither arbitrary nor capricious.

As to the other issues raised by Newton, we think that they were adequately resolved by the single justice. No purpose would be served by recapitulating them here. Having resolved the fundamental questions in favor of the Commissioner, we affirm the declaratory judgment issued by the single justice.

*So ordered.*

---

[9] The degree to which one can obtain a valid statistic depends upon the integrity of the data being tested. There are many communities which will not have a frequency or uniformity of sales which can be relied upon in a short testing period to produce reliable or meaningful results. Because of this the Commissioner may have determined that she could not rely upon community-specific percentage increases in values between 1978 and 1980 equalized valuations. Cf. note 7, *supra*.